Court of Appeals. Mr. Simon. May it please the Court, Your Honors. This case is a wrongful termination claim by TAKOTA CORPORATION. One of the first things I want to jump to is, in order to prove a wrongful termination claim, you have to show that the contracting officer abused their discretion, acted arbitrary or capricious. And one of the factors the Court considers... So why wasn't there a default here under the contract by failing to provide additional shoring when the problem arose? There's different types of sheeting and shoring on this project, and it's something that Judge Below refused to understand from the get-go, and the government jumped on after the fact. They never raised the sheeting and shoring failure, whether it was a submittal or the work itself, until opposition to our summary judgment was never listed as a reason for default. But that's not a problem, is it? I'm sorry? That's not a problem, is it? Yes, it is. Why? Because if the failure to submit a sheeting and shoring plan was so material... No, no, no, no. I'm not talking about the sheeting and shoring plan. What I'm asking you is about the failure to provide additional sheeting and shoring when a problem arose in the course of performance. There is a specific contract provision that says, where there are problems, you provide additional shoring, right? And you didn't, says the government. So my question is, why isn't that a perfectly good ground for finding a breach and having a default termination? Because number one, we followed the contract precisely. It said if the sea walls to this marina began to destabilize upon dewatering, we were supposed to stop the work and notify the contracting officer. There was also a position to provide adequate shoring. The contractor never did that. You're correct. But that had nothing to do with the differing site condition. Shoring is a safety measure to present something from falling over. Our contention regarding the differing site condition was that the state of these sea walls had deteriorated to such an extent that the groundwater from the other side of the groundwater was flowing into the lagoon, so that as the water was going down, it just continued to fill back up. And we put the seal on notice of that on November 2nd, 2006. On December 7th, in a meeting with the ROIC and the contracting officer, the government agreed that in order to stop that groundwater flow into the marina, that the contractor would dig a trench and pour grout. It was an agreement. On January 6th, internally, the ROIC told his boss that was an agreement that we were going to make with the contractor, we need to get the funding, and we need to get an REA for the contractor and adjust the contract price. That same ROIC wrote a letter to Dakota, which is in the record, telling Dakota that's the agreement we made on December 7th. There's a problem with the differing site condition, we're going to trench, we're going to pour grout, and that will stop the problem. What happened next? The AROIC goes to the funding officer, and there is no funding. So you refused to provide the additional sheeting and shoring unless you were paid extra money for it, right? That's not true, Your Honor. We put in a claim on February 1st for work that we had performed in putting the coffer dam in, in order to dewater. When we filed that claim, five days later, the government, the contracting officer, counsel, the ROIC had a meeting, a strategy meeting, and they said because the contractor submitted a claim, we are going to default terminate Dakota. Because they submitted a claim. Their contractual right to do, under the Contract Disputes Act. And when I questioned the AROIC about that meeting, he told me, yes, we did decide, because everyone knows that when a contractor submits a claim, they're not going to do any work for anyone. That's what the AROIC said. And so when the AROIC found out there was no money to fund that extra work that was then the contracting officer issued a notice, the first notice five months later, to resume work. I'm still having trouble understanding, Mr. Simon, how you get around the double shalls here. There's a shall provide adequate shoring, and then when problems arise, there's a shall provide additional shoring. Judge Dyke focuses on the second one. You didn't provide any additional shoring, but it seems to me like you failed the first one too. You didn't provide adequate shoring in the first place. Your Honor, this was at the inception of the project. We got out there. Somebody else came in right after you and did it. Not right after. Five months later, at the end of September, and in the government estimates. But they did it, and they shored, and their shoring was adequate. Right. Because they shored the whole way around the marina. Then that's perhaps what adequate shoring must have required. And it was, because there was a missing specification in Dakota's contract. When we approached the chief engineer, and it's in our briefs, when we approached the chief engineer and said, you know, we have this problem, he said, where's the sheeting and shoring specification? And our project manager said, we don't have one. And he said, oh, it should have been in there. It's not. Well, that's another reason for a violation here, isn't it? You proceeded without your plan, which was supposed to be submitted 15 days before you proceeded to order. No, we did submit a shoring plan as part of our safety plan. And that was acknowledged by the court in his decision below. And a shoring plan, to provide adequate shoring, is when you see something that's dangerous, you shore it. You put sheeting in. You put boards in. You put tiebacks in. A sheeting and shoring plan to do the entire marina is quite different. The government estimate for this job did not include sheeting and shoring. When they prepared the government estimate before they awarded the follow-on contract to Chiesco, they revised their government estimate to specifically provide for sheeting and shoring the whole way around the marina. If that's not an obvious mistake by the Navy in not giving a contractor the right specifications and then hammering for it and then paying somebody else to do it in accordance with what their intentions were, I don't know what is. Did you get a chance to inspect the site in advance? Yes. Did you take it? No. But, Your Honor, you have to understand, this was a lagoon that's filled. A site inspection is observation. What would be there to see other than the water filling a lagoon? Well, the nature of the seawall, I guess. Well, they did tell us in the specifications that the seawalls were deteriorated. And we understood that. And we understood that shoring might be necessary. What we did not understand is that there was a specification out there that required shoring the whole way around the marina. Well, do you disagree that you had to supply adequate shoring? No. And you disagree that the shoring wasn't adequate? I disagree with that because we never had a chance. But it wasn't adequate. The water came through, right? Shoring has nothing to do, and this is what Judge Brueggen failed to understand. The water, the shoring has nothing to do with water coming through the seawalls. Shoring is a stability measure to stop a wall from falling down. If there are holes in the seawall, shoring is not going to prevent water from infiltrating from the other side of the seawall, from the groundwater table. And that's what Judge Brueggen refused to understand. He kept saying, Mr. Simon, the walls are deteriorated. You had to know you had to shore. You didn't shore. You lose. But shoring has nothing to do with water infiltrating into the marina. Yeah, but you yourself, with respect to the additional shoring issue, recognized that if the lagoon was empty, it was likely that the seawall would collapse, right? As we drained the lagoon, there was a likelihood that portions of the seawall could collapse. So why didn't that call for additional shoring under the contract? Your Honor, you're right. Dakota could have put up shoring in that particular location, but they chose to stop because of the differing site condition. And they put the contracting officer on notice. And the contracting officer could have come back and said immediately, no differing site condition, sure. But the ROIC and the government- And then you would have had to do it. Yes, but we never got that chance again. Because once the contracting officer issued the notice to resume work, then they arbitrarily put on us a requirement to submit all the submittals all over again and get them approved before any work- Why was that arbitrary? Because there's nothing in the contract that says you have to resubmit submittals once they're already approved. She put dates on us that had no tie back to the contract. When they issued the resumption notice on March 7th, she said you have to have all these submittals in by April 4th. They never established a new completion date, even though they acknowledged that we're entitled to five months time extension. This resumption notice was a pretext to terminate. They made the decision to terminate on February 7th because we submitted a claim. I'm trying to figure out that you say resubmit. Was there a submittal in the first place? Yes. We submitted a shoring plan as part of our safety plan. We submitted QC plans. We submitted construction schedules. All the submittals that were required were submitted initially and approved, which permitted us to start work. We started work, and we hit a differing site condition. We put the government on notice pursuant to FAR 52-236-2. The contracting officer is supposed to promptly investigate, which they did. That submittal that you submitted wasn't submitted in a timely fashion, was it? Fifteen days prior to beginning work. At the onset, I'm not sure, but I don't know if that's an issue in this case. The issue is, once we gave that notice of differing site condition, the contracting officer promptly investigated, and a meeting was held, and they agreed there was a problem, and a fix was negotiated. Did the Navy say they were going to issue a new timeline once they had figured out the equitable adjustment? No, they put the burden on us on March 7th, which I've never seen before. They said, you tell us when you can finish, and we did. We submitted a schedule. Maybe we should hear from the government, and we'll save you rebuttal time then. Thank you. Thank you, Ms. Simon. Ms. Dempsey? May it please the court. Dakota conflates several issues in stating that the contracting officer didn't issue directions with respect to its differing site condition claim. The differing site condition claim is entirely irrelevant as to whether it materially breached the contract, because they are two wholly separate issues, as Judge Brueggen correctly noted. Dakota's different site condition claim dealt with water seeping through the seawalls into the boat ramp areas, which had to be drained. They stated that the seawalls were deteriorated, which was obvious and was clearly indicated in the contract. On the other hand, the shoring requirement dealt with the significant unbalanced load condition that would occur and the pressure exerted on the Dakota dewatered areas. Therefore, the shoring was for support of the seawalls. Therefore, whether, as Judge Brueggen noted, whether a different site condition claim actually existed, which the government disputed, has— If there wasn't a differing site condition, why did you award the next contractor so much money to compensate for it? It had nothing to do with the differing site condition. The Dakota incorrectly asserts that this increased cost estimate had to do with shoring, but it didn't. The trial court in its footnotes stated that the revisions to this cost estimate dealt with concrete and paving and the temporary cofferdam with respect to the second boat ramp and a 20 percent increase with respect to the passage of time. Therefore, this increased cost estimate had nothing to do with Dakota's failure to shore and the re-procurement contractor actually shoring the seawalls. What I understand them to be arguing is they said we did provide shoring in the first instance. That wasn't shown to be a violation of the contract. And then when we started having problems with the seawall and were  shoring, but you never gave them the chance to put in the additional shoring. That's incorrect. Dakota was given all the opportunity to provide shoring before dewatering, which it was required to do under the construction sequence in drawing C04. The construction sequence specifically stated that Dakota shall provide adequate shoring for the seawalls and then begin dewatering and then demolishing and reconstructing the new boat ramps in the dry. Additional shoring was to occur when Dakota observed weakening or movement of the seawalls, which Dakota did observe. And they seem to agree that they had to provide additional shoring, as I hear them in this oral argument. But they're saying we never had a chance to do it. So what's the answer to that? They did have the chance to do it. In fact, the AROIC on site specifically directed them approximately less than a week after it notified the Navy of the different site condition that it had to provide a shoring and sheeting plan and that it had to provide shoring for the seawalls. Dakota repeatedly refused to comply with the Navy's numerous directives that it follow the contract requirements. And what Dakota is referring to is the notices to resume work, which the Navy issued in March. So Dakota had from the end of October of 2005 to March to shore the seawalls, and it didn't do so. Ms. Dempsey, there was another point that wasn't clear when I was speaking to Mr. Simon, and that is, did the safety plan include the shoring plan? He seemed to say that this safety plan included its shoring plan and that that was timely as far as he was aware. With regards to Dakota's submission of a shoring and sheeting plan, it was undisputed before the trial court that one was not submitted. Dakota admitted in the government's proposed findings of uncontroverted fact, and the trial court noted that Dakota had not submitted a shoring and sheeting plan. And it did not do so because it argued that one was not required under the contract. With respect to the safety plan, the trial court had noted in a footnote that based upon certain correspondence, it was unclear whether Dakota may have submitted this shoring and sheeting plan as part of its safety plan. But the trial court accorded this correspondence no weight because  Additionally, the Navy informed Dakota that the safety plan was not a shoring and sheeting plan. In fact, the safety plan merely referred to a bracing provision in the safety manual and rejected this safety plan as a shoring and sheeting plan. The contract clearly required and stated that this shoring and sheeting plan had to entail drawings and calculations certified by a professional engineer describing the methodology of shoring. Subsequently, Dakota never disputed the Navy's rejection of the safety plan as a shoring and sheeting plan and reverted back to its consistent position throughout this case that it had not submitted a shoring and sheeting plan because one was not required under the contract. Can I return to a point that Judge Dyke was inquiring about? You seem to be saying that Dakota refused to go back to work even though ordered and they say you stopped them from going back to work. Can you show us anywhere in the record where you told them to work and they refused? Sure. In October 28, 2005, Dakota notified the Navy that it believed a different site condition claim existed. The Navy investigated the site and then on November 2, which is court's indulgence. Well, in any event. Maybe a co-counsel could find it while you're addressing the rest of the case. In any event, the record has several correspondents from the Navy to Dakota telling them and directing them to shore the seawalls and submit a shoring and sheeting plan and that it could continue work. The Navy didn't tell Dakota to stop work until later on when Dakota stated that it was going to treat the different site condition claim as a change at which point the Navy said we'll submit an REA, which it refused to do. So at this point in time, the government and the Navy met and discussed a proposed solution to this different site condition claim. But in any event, this different site condition claim was totally irrelevant because to the trial court's decision because Dakota materially breached the contract in the first instance and whether this different site condition existed and whether the Navy failed to issue timely instructions, which it disputes. Is 154 the letter you're talking about? This is October 5th? No, that's the notice to proceed email. That's it. Well, in the government's proposed findings of uncontroverted fact and Dakota's responses for this, it agrees that on, it agrees that which is A248 and A249. On November 1st, 2005, A. Roy Crite advised Dakota that it was required to submit a sheeting and shoring plan and that Dakota was required to employ a geotechnical engineer and follow other contract requirements. And then on November 13th, 2005, which is A250, the Navy further reminded Dakota regarding the contract requirements and directed that Dakota use sheet piling as its temporary cofferdams. Those don't specifically say go back to work, but that's implicit, is that it? It's implicit. It didn't tell them to stop working and it's Dakota. It didn't tell them to stop working and it's Dakota. Dakota was the contractor on this project. They had to continue work and all that the Navy was telling them to do was follow the contract requirements. And they were saying if we do, the wall's going to collapse. Yes, and so they feared that. And you're saying, well, but then they should have had additional shoring. Correct. With respect to, briefly, with respect to the waiver issue, the trial court correctly noted that DeVito waiver was inapplicable to its decision granting the government's motion for summary judgment because DeVito waiver law only applies with respect to a specified contract completion date. Here, the trial court upheld the Navy's default termination based upon Dakota's failure to follow the contract requirements. My law clerk tells me that you should look on page 288. We'll see if they're right. The government directs the contractor to use the sheet piling in its place as specified. That is one of the several correspondence from the Navy to Dakota to follow the contract requirements and use sheet piling. And the Navy had issued several directives, all of which Dakota failed to comply with. And finally, the Navy, well, we respectfully request that this court deny Dakota's request to convert its default termination into one for convenience and support. Dakota contends that the government failed to terminate Dakota upon any reasonable basis and that the Navy issued the termination in bad faith. With respect to Dakota's first contention, the Navy did have reasonable basis and asserted this other basis to the trial court in its motion for summary judgment. But the trial court only granted the government's motion with respect to the one basis which is in front of the court today. Accordingly, if this court should find that the trial court erred with respect to whether Dakota materially breached the contract, it should remand this case back to the trial court to allow it to proceed to trial. Additionally, with respect to Dakota's bad faith claim, this is waived on appeal because it wasn't raised before the trial court. Dakota never put this claim in its complaint. Moreover, in its motion for summary judgment, it specifically states it wasn't relying on a bad faith claim and that it was relying solely upon the government's failure to extend the contract completion date and the government's waiver of the original contract completion date. Accordingly, we respectfully request that this court affirm the trial court's decision. Thank you very much, Ms. Dempsey. Mr. Simon, you have three minutes. Yes. On the bad faith claim, your honors, in our motion, A28, we stated paragraph 5, notwithstanding the Navy's bad faith intentions to default terminate Dakota's contract. Our reason for the summary judgment motion was procedure. We specifically raised bad faith. And then in our motion, we added two counts about the termination being driven by our filing of a claim. And then in our reply brief, we also noted in a footnote 5. But it does seem they were telling you to go back to work and follow the contract. Now, A288, if you look at that, it says use sheet piling. The other measure, that has nothing to do with shoring the seawalls. That's the cofferdam that blocks the lagoon from the creek. And again, this comes from not having a construction backlog. But they're telling you to follow the contract and keep working, aren't they? It's not. The contract said you could use sheet piling or other temporary measures, which is what we used. And that direction came from the assistant ROIC. After we had made a differing site condition claim, if we had gone in and done that work and then pursued a claim against the contracting officer, I guarantee you that contracting officer would have came back and said, you disturbed the conditions. Before I had a chance to address the claim, your claim's denied. That ROIC did not have authority. But there's no evidence that the contracting officer told you not to work. Their citations say that he told you to go work. That's the AROIC, not the contracting officer. The problem in the first place is you don't have adequate shoring and adequate cofferdams. The next contractor put in adequate shoring, adequate cofferdams, and succeeded. Because he had a sheeting and shoring specification. When you look at those estimates, they're at 234 and 235, line items 17 and 29. They specifically say temporary cofferdam, new price, 300 feet, times 10 feet, times 35 feet. That's the circumference of the marina. The government didn't have it in their estimate. They didn't include the specification. It was supposed to tell the contractor how to do it. And they gave it to the next guy for $200,000 more than our contract price. That's all I have. Thank you very much, Mr. Simon. Our final case